UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRIAN LOTT,

        Petitioner,

v.                          CASE NO. 08-14367
                                HONORABLE DENISE PAGE HOOD

JEFFREY WOODS,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION**
**FOR WRIT OF HABEAS CORPUS AND**
**GRANTING IN PART A CERTIFICATE OF APPEALABILITY**

Petitioner Brian Lott has applied for the writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. The habeas petition challenges Petitioner's convictions for possession with intent

to deliver cocaine and conspiracy to possess with intent to deliver cocaine. The grounds

for relief are (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct, (3)

denial of the right to confront witnesses, and (4) cumulative effect of errors. Respondent

Jeffrey Woods urges the Court to deny the petition. Having reviewed the pleadings and

record, the Court finds that the state court's rejection of Petitioner's claims was reasonable.

Accordingly, the habeas petition will be denied.

**I. BACKGROUND**

    **A. The Facts**

The facts leading to the charges against Petitioner have been summarized by the

state court as follows:

On February 11, 2004, in response to information regarding potential narcotics trafficking, Deputy Kenneth Rumps of the Macomb County Sheriff's Department began surveillance of a 2003 Chevy Blazer located in the parking lot of the Extended Stay Hotel in Roseville, Michigan. About 9:00 p.m., Rumps observed Ronnie Kevin Turrentine leave the hotel, enter the Blazer, and drive away. After calling for backup, Rumps followed the Blazer and observed Turrentine make a series of traffic infractions. Because Rumps was in an unmarked car, he notified an officer in a marked car to pull over the Blazer for a traffic stop.

Rumps and other officers arriving on the scene conducted a normal traffic stop. After learning that Turrentine was from another state and driving a rental car and receiving evasive answers from Turrentine regarding his reasons for visiting Detroit, the officers grew suspicious. Two officers had police dogs with them, and they had the dogs conduct exterior sniffs of the Blazer to locate narcotics. Both dogs indicated that they smelled narcotics near the rear driver's side tire and wheel well of the Blazer and under the vehicle's carpeted trunk. When searching the vehicle, the officers noticed that the bolts used to hold the gas tank to the undercarriage of the Blazer looked unusually clean and were covered in fresh grease. The officers also noticed scuff marks near the gas tank. An officer in possession of a fiber-optic scope threaded the scope through the opening of the gas tank and noticed white packages with black zip ties inside the tank. The officers immediately drove the Blazer to the Oakland County Sheriff's Department Central Garage, where garage mechanics removed the gas tank and found 22 heat-sealed bricks of cocaine inside.[1]

The officers also confiscated a key to Room 328 of the Extended Stay Hotel from Turrentine. Room 328 was registered to Turrentine on the night in question. Rumps immediately contacted other officers to begin surveillance of Room 328 and returned to the hotel. Eventually, [Petitioner] and Kareem Dale Rhodes attempted to enter Room 328. The officers detained them and escorted them to the room across the hall, where they confiscated a key to Room 328 of the Extended Stay Hotel found in their possession.

When defendant admitted that he had driven to the hotel, the officers asked to search his vehicle. Defendant said that he was driving a Ford Taurus and permitted the officers to take his car keys. The officers located the vehicle in the parking lot, and a police dog performing an exterior sniff of the car identified the scent of narcotics at the back of the trunk and on the driver's side door handle. The officers, including Rumps, opened the trunk

---

[1] The weight of the cocaine totaled 11 kilograms.

2

and found a toolbox with miscellaneous tools, a red bucket, nylon pants, and a nylon jacket inside. The red bucket contained a box of natural latex disposable gloves, a pair of size 12 Neoprene shoes, a hat, a sponge, and more nylon clothing. Among the tools in the box was a 15–millimeter socket with grease in it and a 15–millimeter wrench.[2] The trunk also contained two heat sealers of different sizes, rolls of FoodSaver plastic in a plastic bag, rubber bands, a box cutter razor knife, and a black handheld bag with a red zip tie containing three plastic rolls and an extension cord.

After searching the Taurus, the officers transported defendant and Rhodes to the Macomb County Jail, where Detective Sergeant Terrance Mekoski of the Oakland County Sheriff's Department questioned them. Defendant told Mekoski that he was from California and had arrived in Michigan the previous day to meet a female. When Mekoski asked for the female's name, defendant paused and then replied "Veronica." Defendant claimed that he arrived at Detroit Metro Airport the day before, rented the Taurus, and drove to Veronica's apartment on the east side of Detroit. Defendant claimed that he spent the night with her, but his interaction with Veronica "wasn't what he thought it was going to be" and he left the following day. Defendant claimed that he could not provide her last name, an address or the specific location of the apartment, or a telephone number.

Defendant claimed that Turrentine also happened to be visiting Detroit at this time. Defendant and Turrentine knew each other, and defendant claimed that he left Veronica's apartment on the morning of February 11, 2004, to meet Turrentine and stay in his hotel room at the Extended Stay Hotel. After meeting with Turrentine that morning, defendant "drove around the whole day going to various malls . . . ." Eventually, defendant went to Eastland Mall, where he had a chance encounter with Rhodes, another acquaintance. Defendant and Rhodes left the mall together in defendant's rented Taurus and spent the rest of the day traveling from mall to mall and "hooking up with girls."

Mekoski also interviewed Rhodes in the Macomb County Jail's interview room that evening. Rhodes waived his Miranda rights and spoke with Mekoski. Rhodes claimed that he had flown to Detroit from California approximately one week before his arrest. He claimed that he had been staying at the Quality Inn near the Detroit Metro Airport, but recently switched lodgings and was staying at the Extended Stay Hotel. Rhodes confirmed that he and defendant had been "hanging out" and "hooking up with girls" when visiting the Detroit area, but he did not provide names, addresses, or

---

[2] Rumps noticed that these tools were similar to the tools that the county mechanics used to remove the gas tank from the Blazer.

telephone numbers of these females.

Mekoski then described to Rhodes what the officers had found in Turrentine's Blazer and defendant's Taurus. When he asked Rhodes where the narcotics would be delivered, Rhodes admitted that the narcotics were scheduled for delivery at a house on the east side of Detroit. Rhodes also admitted that the police found the narcotics just before their scheduled delivery.

*People v. Lott*, No. 265051 at *1-3  (Apr. 19, 2007) (footnotes in original with different numbers).

### B. The Trial, Sentence, and Appeal

Petitioner was tried jointly with Ronnie Turrentine and Kareem Rhodes. On January 14, 2005, the jury found all three defendants guilty, as charged, of possession with intent to deliver 1,000 or more grams of cocaine, *see* Mich. Comp. Laws § 333.7401(2)(a)(i), and conspiracy to possess with intent to deliver 1,000 or more grams of cocaine, *see* Mich. Comp. Laws § 750.157a and Mich. Comp. Laws § 333.7401(2)(a)(i). The trial court sentenced Petitioner to two concurrent sentences of fourteen years, eleven months, to thirty years with 392 days of credit for time served.

Petitioner moved for a new trial on grounds that his trial attorney was ineffective and the evidence was insufficient to support the jury's verdict. The trial court held an evidentiary hearing, known as a *Ginther* hearing[3], and denied Petitioner's motion.

Petitioner raised his pending claims in an appeal of right. The Michigan Court of Appeals affirmed his convictions in an unpublished decision, *see People v. Lott*, No. 265051 (Mich. Ct. App. Apr. 19, 2007), and on October 17, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See*

---

[3] *See People v. Ginther*, 390 Mich. 436, 443; 212 N.W.2d 922 (1973).

4

*People v. Lott*, 480 Mich. 911; 739 N.W.2d 621 (2007).

### C.  The Habeas Petition and Responsive Pleading

Petitioner filed his habeas corpus petition through counsel on October 15, 2008.  He alleges that (1) his trial attorney was ineffective, (2) the prosecutor committed multiple instances of misconduct, (3) his right to confront the witnesses against him was violated, and (4) the cumulative effect of the trial errors deprived him of due process and a fair trial.

Respondent argues in an answer to the habeas petition that Petitioner's third claim (denial of the right to confront witnesses) and portions of the second claim (prosecutorial misconduct) are procedurally defaulted because Petitioner failed to object to the claimed errors at trial.  Respondent contends that Petitioner's remaining claims lack merit.

Procedural default is not a jurisdictional limitation.  *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274, 176 L.Ed.2d 1182 (2010). The Court therefore will proceed to adjudicate the merits of Petitioner's claims, using the following standard of review.

## II.  STANDARD OF REVIEW

A habeas petitioner is entitled to the writ of habeas corpus only if the state court's adjudication of his or her claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state

5

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20, 146 L. Ed. 2d 389 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id*.,  529 U.S. at 409, 120 S. Ct. at 1521.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*., 529 U.S. at 411, 120 S. Ct. at 1522.  "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct."  *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786, 178 L.Ed.2d 624 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.Ed.2d 938 (2004)).  To obtain a writ of habeas corpus, a state prisoner must show that the state court's ruling "was so lacking in justification" as to result in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*., 131 S. Ct. at 786-87.

## III.  DISCUSSION

6

### A. Trial Counsel

Petitioner alleges that his trial attorney's actions and inactions amounted to constitutionally ineffective assistance of counsel. Specifically, Petitioner contends that trial counsel should have: (1) moved to sever his case from that of his co-defendants; (2) filed a pretrial motion challenging the search of the Ford Taurus; (3) filed a pretrial motion *in limine* to redact co-defendant Kareem Rhodes' custodial statement; (4) objected to Sergeant Terrance Mekoski's testimony regarding co-defendant Rhodes' statement; (5) investigated and called defense witnesses; (6) made a legally cognizable defense; (7) made an opening statement; and (8) made appropriate objections or arguments during trial. Petitioner further alleges that defense counsel made improper arguments at the close of the case and that the cumulative effect of the errors deprived him of a meaningful defense.

The trial court held an evidentiary hearing on these claims and concluded in a written opinion that trial counsel was not ineffective. The Michigan Court of Appeals agreed, stating that Petitioner had failed to establish that any of his allegations about trial counsel warranted reversal of his convictions.

### 1. Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is clearly established federal law. *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1403 (2011). Under *Strickland*, an attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To establish deficient performance, a habeas petitioner must show "that counsel made errors so serious

7

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*., 466 U.S. at 689, 104  S. Ct. at 2065.

To demonstrate that counsel's performance prejudiced the defense, a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*., 466 U.S. at 694, 104 S. Ct. at 2068.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2052).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*., 131 S. Ct. at 788 (internal and end citations omitted).

### 2.  Severance

Petitioner asserts that his trial attorney should have moved to sever his trial from that of his co-defendants.  The trial court determined that defense counsel's failure to file a pretrial motion to sever was not deficient counseling, and the Michigan Court of Appeals also found no merit in Petitioner's claim.

> [J]oint trials of defendants charged under a single conspiracy aid the finder of fact in determining the "full extent of the conspiracy," *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir.), *cert. denied*,  459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982), and prevent "the tactical disadvantage to the government from disclosure of its case."  *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981).

*United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996).  Severance is appropriate when "there is a serious risk that a joint trial would compromise a specific trial right of one of the

8

defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

Petitioner contends that his joint trial created a tremendous risk that he would be found guilty by association with his co-defendants. In addition, argues Petitioner, the statement of co-defendant Kareem Rhodes was not properly redacted and Sergeant Mekoski mistakenly testified that Rhodes had said he was with Petitioner on the day in question and that they had acquired the cocaine before the police stopped Ronnie Turrentine.

The actual testimony was that, during Sergeant Mekoski's interrogation of Kareem Rhodes, Mekoski explained to Rhodes that the police had conducted a surveillance and stopped the Chevy Blazer. Mekoski also informed Rhodes what the police had found in the vehicle and in the Ford Taurus. Rhodes then told Mekoski that the narcotics were supposed to be delivered to a house on the east side of Detroit. Mekoski went on to ask Rhodes when the narcotics were expected to be delivered. According to Mekoski, Rhodes responded, "They were supposed to be delivered later on that day. That we had got them just before, just prior to making the delivery." (Tr. Jan. 13, 2005, at 115.) The "we" in this comment is ambiguous and did not necessarily mean that Rhodes and Petitioner acquired the narcotics shortly before they intended to deliver the narcotics. The jury could have understood the comment to mean that the police discovered the narcotics in Ronnie Turrentine's Chevy Blazer immediately before Turrentine's attempted delivery of the cocaine. Even if the jury understood the comment to mean that the police arrested Petitioner and Rhodes shortly before they acquired the narcotics, defense counsel could not necessarily have anticipated the comment. Sergeant Mekoski apparently made the

9

comment inadvertently.

Defense counsel testified at the *Ginther* hearing that he chose not to move for a separate trial because he wanted to show that Petitioner was merely present and did nothing to advance the conspiracy.  He also thought that the jury might conclude that Petitioner was the least culpable of the three defendants and that there was reasonable doubt as to him.  (Tr. June 3, 2005, at 143-47.)  This was a reasonable basis for not moving for separate trials, particularly where the prosecutor assured defense counsel that Sergeant Mekoski would redact Rhodes' statement to substitute "I" for "we" or "us."  (Tr. Jan. 12, 2005, at 7-8.)

As for the risk of being found guilty by association, the trial court charged the jury at the beginning of the case and at the conclusion of the case that the jurors should consider each defendant separately.  The court stated that the joint trial was not evidence that the defendants were associated with each other or that anyone was guilty, that each defendant was entitled to have his case decided on the evidence and law that applied to him, and that, if evidence was limited to one defendant, the jurors should not consider it as to any other defendant.  (Tr. Jan. 12, 2005, at 121-22; Tr. Jan. 14, 2005, at 76-77.)  The trial court also charged the jury not to use Kareem Rhodes' statement against Petitioner. (Tr. Jan. 14, 2005, at. 78.)  Finally, the trial court stated that each defendant was entitled to have his guilt or innocence decided individually.  (*Id*. at 86.)

 "Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (citing *Zafiro*, 506 U.S. at 540-41, 113 S.Ct. 933).  The Court therefore concludes that defense counsel's failure to move for severance

10

did not amount to deficient performance, and even if counsel's performance were deficient, the deficient performance did not prejudice the defense.

### 3.  The Search of the Ford Taurus

Petitioner claims that his trial attorney should have moved to suppress evidence found in the Ford Taurus, which Petitioner was renting on the day of his arrest.  Petitioner maintains that he did not give consent to a search of the vehicle and that there was no probable cause to search it.  The trial court determined that defense counsel's failure to file a motion to suppress evidence did not amount to ineffective assistance.  The Michigan Court of Appeals agreed.

The United States Supreme Court has stated that the failure to file a motion to suppress evidence "does not constitute *per se* ineffective assistance of counsel. " *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must . . . prove that his Fourth Amendment claim is meritorious and . . . a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.*, 477 U.S. at 375, 106 S. Ct. at 2583.

Petitioner and three other witnesses testified at the *Ginther* hearing that Petitioner's trial attorney planned to file a motion to suppress.  (Tr. June 3, 2005, at 13-15 (Petitioner's testimony); Tr. June 30, 2005, at 16-17, 28 (Kathy Beaudoin's testimony); Tr. July 13, 2005, at 37 (Milton Grimes' testimony); Tr. July 13, 2005, at 81 (Betty Wallace's testimony)). Petitioner's trial attorney, however, testified that two officers had claimed that Petitioner consented to the search, and, before or at the preliminary examination, Petitioner informed

11

him that he had consented to the search.  The attorney thought that he had little or no chance of winning a motion to suppress evidence and that he would be wasting everyone's time by filing a frivolous motion.  (Tr. June 3, 2005, at 159-66, 170, 175, 177, 189, 211, 229-31, 238.)

Petitioner denied giving consent to the search.  He also denied telling trial counsel that he consented to the search.  (*Id*. at 12-13, 105-06.)  However, the other evidence in the case supports trial counsel's testimony on the issue. According to the trial court, the police report indicated that Petitioner consented to the search.  And Deputy Sheriff Kenneth Rumps testified that Petitioner handed the car keys to Detective Christopher Topacio when Topacio asked for permission to search the vehicle.  (Tr. Jan. 12, 2005, at 198.)

Detective Topacio initially testified that Petitioner handed the car keys to him.  (Tr. Jan. 13, 2005, at 68-69.)  Topacio subsequently testified that Petitioner informed him that the keys were on the dresser in the hotel room.  (*Id*. at 72.)  This testimony indicates that Petitioner consented to a search of the car which he rented, and consent is a valid basis for a search.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854 (1973).  Therefore, a motion to suppress would have lacked merit, and defense counsel was not ineffective for failing to file the motion.

### 4. Sergeant Mekoski's Testimony regarding Kareem Rhodes' Statement

Petitioner alleges that his trial attorney should have (a) filed a pretrial motion *in limine* to redact co-defendant Kareem Rhodes' custodial statement and (b) objected when Sergeant Mekoski testified about un-redacted portions of Rhodes' statement.  The Court agrees with the trial court and the Michigan Court of Appeals that there is no merit in Petitioner's claim.  The attorneys worked out an agreement on how to redact Kareem

12

Rhodes' statement:  all references to "we" in Rhodes' statement would be replaced by the word "I."  (Tr.  Jan. 12, 2005, at 7-9.)  Because of the negotiated agreement on redaction, it was unnecessary to file a formal motion *in limine*.

A problem occurred when Sergeant Mekoski testified about his interrogation of Kareem Rhodes.  As noted above, Mekoski explained that he had asked Rhodes when the narcotics were to be picked up.  According to Mekoski, Rhodes answered that they were supposed to be delivered later that day and that "*we* had got them just before, just prior to making the delivery."  (Tr. Jan. 13, 2005, at 115) (emphasis added).  Sergeant Mekoski apparently was supposed to redact Rhodes statement by saying, "*I* had got them . . . ."  (Tr. June 3, 2005, at 180-81.)

Although Petitioner claims that Mekoski's use of the phrase "we had got them" implicated him in the conspiracy, the phrase is ambiguous.  Because Sergeant Mekoski was explaining what Rhodes had said to him, the jury could have interpreted the "we" in his testimony to mean the police.  Thus, the testimony could have meant that the police found the narcotics shortly before the intended delivery.  Even if the phrase "we had got them" implicated Petitioner, it was a passing remark.  Sergeant Mekoski immediately went on to say that he had asked Rhodes about the monetary value of the deal and whether Rhodes could provide information or assistance to the police.

The other evidence, moreover, strongly implicated Petitioner in the crimes.  He admitted to the police that he spent part of the day with Kareem Rhodes, and the police found him and Rhodes trying to get into Ronnie Turrentine's hotel room shortly after the police stopped Turrentine with a gas tank full of cocaine.  Tools and clothing in Petitioner's rented car could have been used to remove the gas tank from Turrentine's Chevy Blazer

13

and insert the cocaine.  In addition, police dogs detected the smell of narcotics on the door handle of Petitioner's rented car.

It is unlikely that the result of the trial would have been different if defense counsel had objected to the remark, "We had got them."  The objection would have drawn attention to the remark, and there was substantial other evidence that Petitioner was involved in drug trafficking.  Therefore, the allegedly deficient performance did not prejudice the defense.


### 5.  Failure to Investigate

Petitioner alleges that defense counsel should have investigated witnesses, subpoenaed the witnesses, and produced them at trial.  Attorneys do have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S. Ct. 2066.  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence."  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000).

### a.  Possible Witnesses

Petitioner mentions a hotel manager as one possible witness, but he has not explained what the hotel manager would have said to support his defense.  At the *Ginther* hearing, Petitioner testified that the hotel employee had something to do with calling the

14

police and that he and his co-defendants thought she would be critical to their defense.  He

admitted, however, that he had never spoken with the hotel employee about what her

testimony would be, and he did not know the employee's name.  Nor was he able to give

a physical description of the employee to his attorney.  (Tr. June 3, 2005, at 19.)  He also

admitted that he did not know how the hotel employee would help his defense.  (*Id*. at 93-

96.)  Under the circumstances, the failure to locate and produce the hotel employee did not

amount to ineffective assistance.

Petitioner also claims that his attorney should have called the woman that he was

visiting in Detroit.  In his statement to the police, however, he was unable to provide the

woman's surname, address, or location (Tr. Jan. 13, 2005, at 109), and in his habeas

petition, he identifies the woman only as "Veronica."  At the *Ginther* hearing, Petitioner

testified that Veronica would have demonstrated that he was credible, because the police

made it seem like he had lied about visiting her.  (*Id*. at 22, 97.)  But trial counsel testified

that Petitioner did not have the woman's name and that Petitioner did not say the woman

could provide testimony that would  assist him.  (Tr. June 3, 2005, at 203-04.)

The Court finds that defense counsel made a reasonable decision not to investigate

the hotel employee and "Veronica."  Attorneys may "draw a line when they have good

reason to think further investigation would be a waste."  *Rompilla v. Beard*, 545 U.S. 374,

383, 125 S. Ct. 2456, 2463, 162 L. Ed. 2d 360 (2005)).

### b.  Expert Witnesses

Petitioner claims that defense counsel should have called an expert witness to testify

about dog sniffs of the Ford Taurus he rented and tools in the trunk of the vehicle.

Although "in some cases counsel would be deemed ineffective for failing to consult or rely

15

on experts, . . . even that formulation is sufficiently general that state courts would have wide latitude in applying it." *Harrington v. Richter*, 131 S. Ct. at 789.

Defense counsel testified at the *Ginther* hearing that he consulted a mechanic and people knowledgeable about mechanical things. He also spoke with some people who knew about police canine units and what dogs were capable of smelling. (Tr. June 3, 2005, at 195, 203.) Counsel did not say what the results of those conversations were, and it is mere speculation to think that a mechanic would have testified that the tools in Petitioner's rented car were not compatible with the gas tank on the Chevy Blazer. In fact, Deputy Sheriff Kenneth Rumps testified at trial that one of the tools in Petitioner's rented vehicle was like the tool used by county officials to remove the drive shaft on the Chevy Blazer. (Tr. Jan. 12, 2005, at 200). The prosecution, moreover, did not produce an expert witness to show that the tools were used on the Chevy Blazer. The tools were merely circumstantial evidence that Petitioner was involved in drug trafficking.

As for the drug-sniffing dogs, it is unlikely that an expert defense witness would have make a difference in the outcome of the trial, given the fact that one of the same dogs used on Petitioner's rented car successfully alerted to the cocaine found in Ronnie Turrentine's rented vehicle. (Tr. Jan. 13, 2005, at 73.) A second dog also alerted to narcotics in the Chevy Blazer. An expert defense witness would have had to refute that evidence and somehow demonstrate that drug-sniffing dogs are unreliable. It was reasonable trial strategy not to expend resources on hiring an expert witness to testify about drug-sniffing dogs.

Petitioner has not overcome the presumption that the decision not to call the proposed witnesses was reasonable trial strategy. Therefore, the trial court's conclusion

16

that trial counsel did not err is objectively reasonable.  The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

### 6.  The Lack of an Opening Statement and Alleged Failure to Defend

Petitioner faults his attorney for not making an opening statement and for not putting on a defense.  Petitioner claims that the lack of an opening statement and the failure to produce witnesses left the jury guessing as to what the defense theory was.

The purpose of an opening statement is "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole . . . ." *United States v. Dinitz*, 424 U.S. 600, 612, 96 S. Ct. 1075, 1082, 47 L.Ed.2d 267 (1976) (Burger, C.J., concurring).  None of the defense attorneys made an opening statement in this case.  The waiver was appropriate because the attorneys did not present any evidence.  (Tr. Jan. 13, 2005, at 159.)

Petitioner's attorney, moreover, provided several good reasons at the *Ginther* hearing for not making an opening statement.  He thought that an opening statement might draw attention to Petitioner's case and encourage the prosecutor to devote additional time to establishing his case against Petitioner.  He preferred to leave the prosecution to its proofs and not to remind the prosecutor of the shortcomings in his case.  He also did not want to be redundant and insult the jury by repeating legal principles that had been raised over and over during *voir dire*.  (Tr. June 3, 2005, at 148 -50, 153-55.)

The Court concludes that it was reasonable trial strategy not to make an opening statement.  "An attorney's decision not to make an opening statement 'is ordinarily a mere

17

matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel.'" *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004)(quoting *Millender v. Adams*, 187 F. Supp. 2d 852, 870 (E. D. Mich. 2002) (quoting *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 457 (9th Cir. 1985)).

As for the failure to produce any evidence at trial, this also was reasonable trial strategy, given the defense theory that the prosecution had failed to prove its case. None of the other defense attorneys produced any evidence, and,

> [t]he decision to proceed with a unified defense strategy was a matter of trial tactics. "[C]o-defendants may, in fact, benefit from the presentation of a united defense against a common attack. 'Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.' " *United States v. Bradshaw*, 719 F.2d [907, 915 (7th Cir. 1983)] at 915, citing *Glasser v. United States*, 315 U.S. 60, 92, 62 S. Ct. 457, 475, 86 L. Ed. 680 (1942) (Frankfurter, J., concurring).

*United States v. Mooney*, 769 F.2d 496, 500 (8th Cir. 1985).

Petitioner has failed to show how his proposed witnesses would have helped his case, and the only physical evidence that he claims his attorney should have admitted was a lab report. The report indicated that the plastic bags used to wrap the cocaine in the gas tank of the Chevy Blazer were different from the plastic bags seized from the trunk of the Ford Taurus, which Petitioner rented. The prosecutor, however, did not attempt to show that the bags in Petitioner's rented car were actually used to wrap the cocaine found in the Chevy Blazer. He merely implied that the items in the Ford Taurus could have been used to remove the gas tank from the Chevy Blazer. Even if Petitioner could have shown that the bags in his rented car were different from the ones used to package the cocaine, the other items in the trunk of the Ford Taurus, particularly the tools, implicated him in the conspiracy.

18

The Court concludes for all the foregoing reasons that defense counsel was not ineffective for failing to produce any witnesses or physical evidence and for failing to give an opening statement.  "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  *Harrington v. Richter*, 131 S. Ct. at 890.

### 7.  Failure to Object

Petitioner contends that defense counsel was ineffective for failing to make appropriate objections and arguments during trial.  According to Petitioner, trial counsel should have (a) presented a factual basis for granting a motion for directed verdict of acquittal, (b) objected to Sergeant Mekoski's testimony about co-defendant Kareem Rhodes' statement, and (c) objected to the prosecutor's closing argument, which referred to Rhodes' statement and which included facts not in evidence.

The defense attorneys agreed among themselves, and with the trial court's permission, that an objection by one defense attorney would count as an objection by the other defense attorneys.  (Tr. Jan. 12, 2005, at 106.)  Petitioner's attorney concurred in the motion for a directed verdict made by counsel for Ronnie Turrentine.  He also made a brief argument in support of the common defense theory that there was no conspiracy and that there have to be two or more people acting in furtherance of a crime for a conspiracy to occur.  (Tr. Jan. 13, 2005, at 163.-64.)

Trial counsel's failure to object to Sergeant Mekoski's testimony about Kareem Rhodes' statement to the police did not amount to ineffective assistance, because the disputed testimony was ambiguous.  The failure to object to the prosecutor's conduct and comments also did not amount to ineffective assistance because the prosecutor's conduct

19

and comments were not improper or flagrant.  For all these reasons, defense counsel's failure to make additional arguments or objections did not amount to ineffective assistance.

### 8.  Trial Counsel's Closing Argument

Petitioner claims that his attorney was ineffective for stating in his closing argument that the jury should find Petitioner not guilty because Kareem Rhodes did not mention Petitioner's name in his statement to the police.  Defense counsel testified at the *Ginther* hearing that he thought he could make the argument, although he knew that he was right "on the edge" in doing so.  (Tr. June 3, 2005, at 181-90, 201.)  The argument was improper because Rhodes' statement was redacted to eliminate Petitioner's name.  Nevertheless, even though the trial court was critical of Petitioner for making the argument, the court did not admonish Petitioner in the jury's presence, and, as the state courts recognized, Petitioner likely benefitted from the suggestion that Rhodes did not mention Petitioner in his statement to the police.  The prosecutor objected two other times to trial counsel's closing argument, but the jury was not informed of the reasons for the objections, and Petitioner has not shown how he was prejudiced by the arguments and objections.

Petitioner faults his attorney for arguing that the room key for the Extended Stay Hotel was not placed in evidence.  (Tr. Jan. 14, 2005, at 58.) The keys taken from Petitioner, Kareem Rhodes, and Ronnie Turrentine were introduced at trial and admitted into evidence.  (Tr. Jan. 12, 2005, at 206-07).  Although defense counsel was mistaken, Petitioner was not prejudiced by the remark.

### 9.  Conclusion on Petitioner's Claims about Trial Counsel

Petitioner's trial attorney may not have been perfect, but Petitioner had a joint trial, and it was appropriate for trial counsel to adopt the strategy of the other attorneys and

20

leave the prosecution to its proofs.  It was also appropriate to take a fairly inactive role at trial and to permit the other attorneys to take the lead in making arguments and objections, because the case against Petitioner's co-defendants was stronger than the case against Petitioner.  Ronnie Turrentine was found with eleven kilos of cocaine in his gas tank, and Kareem Rhodes made admissions to the police.

Even if trial counsel's performance was deficient, there is not a reasonable or substantial probability that the result of the trial would have been different but for the alleged deficiencies.  And, given the doubly deferential review that applies to ineffective-assistance-of-counsel claims on habeas corpus review, Petitioner's claim fails.  There were reasonable justifications for the state appellate court's decision that counsel satisfied *Strickland's* deferential standard.  The Court therefore declines to grant relief on the basis of Petitioner's ineffective-assistance-of-counsel claim.

Although Petitioner argues that the combined effect of his trial attorney's actions and inactions were so egregious as to require a new trial, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  Constitutional errors that would not individually support habeas relief simply cannot be cumulated to support habeas relief.  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (citing *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002), and *Lorraine v. Coyle*, 291 F.3d at 447).

### B.  The Prosecutor

Petitioner contends that the prosecutor engaged in misconduct which permeated his trial and deprived him of due process and a fair trial.  The Michigan Court of Appeals stated on review of this claim that none of the alleged errors constituted prosecutorial misconduct.

21

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review."

*Millender v. Adams*, 376 F.3d at 528 (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir.

2003)).  To prevail on his claim, Petitioner must demonstrate that the prosecutor's remarks

infected the trial with such unfairness "as to make the resulting conviction a denial of due

process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L.Ed.2d

431 (1974).

Courts in this Circuit employ a two-prong test for determining whether prosecutorial

misconduct rendered a trial fundamentally unfair.  *Slagle v. Bagley*, 457 F.3d 501, 515 (6th

Cir. 2006) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).  First, a court

asks whether the prosecutor's conduct or remarks were improper.  *Id*. at 516.  Second, if

the conduct or remarks were improper, a reviewing court must consider the following four

factors to determine whether the improper acts were so flagrant as to warrant reversal:

> (1) whether the evidence against the defendant was strong, (2) whether the
> conduct of the prosecution tended to mislead the jury or prejudice the
> defendant; (3) whether the conduct or remarks were isolated or extensive;
> and (4) whether the remarks were made deliberately or accidentally.

*Id.*

Claims of prosecutorial misconduct also are subject to harmless-error analysis.

*Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003).  An error is harmless unless it had

a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v.

Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting

*Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L.Ed 1557 (1946)).

### 1.  The Prosecutor's Questions During Voir Dire

Petitioner claims that the prosecutor engaged in improper questioning during *voir dire* by singling out juror Cheryl Johnston and by trying to force Ms. Johnston to provide the answer that the prosecutor wanted to hear. Petitioner claims that this tainted the entire jury pool and sent a message to the jury that the prosecutor thought Ms. Johnston had given the wrong answer.

The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner did not object at trial. The Court of Appeals concluded that the alleged error did not deprive Petitioner of a fair trial and was harmless.

The incident in question arose when the prosecutor asked Ms. Johnston whether she could possibly drive her car and not know that she had eleven kilos of cocaine concealed in the gas tank. Ms. Johnston answered, "Sure." The prosecutor then asked, "How about if . . . the space of the cocaine is so voluminous[?]" (Tr. Jan. 12, 2005, at 88.) These questions were related to the prosecutor's theory that Ronnie Turrentine must have known that there were eleven kilos of cocaine in the gas tank of the Chevy Blazer he was driving at the time of his arrest.

The disputed exchange was a minor episode during *voir dire*. The prosecutor pursued a different line of questioning immediately after Ronnie Turrentine's attorney objected to the questions, and there was no subsequent testimony or argument suggesting that Petitioner had driven the vehicle with cocaine in the gas tank. The Court therefore agrees with the Michigan Court of Appeals that the alleged error could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless. *Brecht v. Abrahamson,* 507 U.S. at 623, 113 S.Ct. at 1714. Petitioner is not entitled to relief on the basis of the prosecutor's questions during *voir dire*.

23

### 2. *Batson*

Petitioner alleges next that the prosecutor improperly exercised a peremptory challenge based on race or ethnicity.  The Michigan Court of Appeals reviewed this claim *de novo* and concluded that Petitioner had failed to establish a *prima facie* case of racial discrimination.   The Court of Appeals further concluded that, even if Petitioner had established a *prima facie* showing of race-based discrimination, the prosecutor's race-neutral explanation was sufficient to rebut the *prima facie showing.*

"Under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), and later decisions building upon *Batson*, parties are constitutionally prohibited from exercising peremptory challenges to exclude jurors on the basis of race, ethnicity, or sex."  *Rivera v. Illinois*, __ U.S. __, __, 129 S. Ct. 1446, 1451, 173 L. Ed. 2d 320 (2009).

> *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:
>
>> " 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' "

*Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S. Ct. 1203, 1207, 170 L.Ed.2d 175 (2008) (alterations in original) (end citations omitted).  A person may establish "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Batson*, 476 U.S. at 93-94, 106 S. Ct. at 1721.

Petitioner is an African American, as were his co-defendants, and the juror in question, Vaundle Jones, apparently was the only African American in the jury box when

24

the prosecutor excused her. She stated that she had previously served as a juror in a criminal case and that the jury in that case had found the defendant not guilty. Even though Ms. Jones claimed that she could be a fair and impartial juror and that she could find someone guilty if the prosecution proved its case beyond a reasonable doubt, the prosecutor eliminated her from the jury. (Tr. Jan. 12, 2005, at 31-33, 43-44, 64, 99.) The Court therefore assumes for purposes of this opinion that Petitioner has established the first step–that the peremptory challenge was based on race.

The next step in the analysis is to determine whether the prosecutor had a race-neutral explanation for eliminating the juror. He claimed at trial that his decision to excuse Ms. Jones was due to her not-guilty verdict in the same county two to four years earlier. (*Id.* at 104-05.)

Using a peremptory challenge to eliminate a juror who previously served on a jury in a criminal case and acquitted the defendant is a race-neutral explanation. *See United States v. Douglas*, 525 F.3d 225, 241 (2nd Cir. 2008). Although Petitioner claims that the prosecutor's explanation was pre-textual, the reason offered by a prosecutor is deemed race neutral "'[u]nless a discriminatory intent is inherent in the prosecutor's explanation.'" *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995). There was no discriminatory intent inherent in the prosecutor's explanation, and he denied that his reason for eliminating Ms. Jones was related to race. The Court therefore rejects Petitioner's argument that the prosecutor's explanation was pre-textual.

The third step of the *Batson* analysis requires determining whether the defendant has shown purposeful discrimination. The trial court did not believe that there was a showing of discrimination. The court opined that the prosecutor would have excluded any

25

juror who provided the same information, regardless of race.  (Tr. Jan. 12, 2005, at 105.)
The Michigan Court of Appeals also determined that Petitioner did not establish purposeful
discrimination.

"[T]he trial court's decision on the ultimate question of discriminatory intent
represents a finding of fact of the sort accorded great deference on appeal."  *Hernandez
v. New York*, 500 U.S. 352, 364, 111 S. Ct. 1859, 1868, 114 L.Ed.2d 395 (1991).  Because
the prosecutor presented a race-neutral explanation for his use of a peremptory challenge
to eliminate Ms. Jones, the Court finds Petitioner has failed to establish a *Batson* claim.

### 3.  The Prosecutor's Opening Argument

Petitioner claims that the prosecutor erred by displaying some tools during his
opening statement and arguing that the tools were used for a specific job and that they
included a socket head, which fit the bolts that hold a gas tank.  (Tr. Jan. 12, 2005, at 149-
51.)  The tools had been seized from the Ford Taurus, which Petitioner rented.  Petitioner
claims that the prosecutor's comments were improper because the tools had not been
admitted in evidence and the subsequent testimony did not support the implication that the
tools were used to remove the gas tank from the Chevy Blazer for the purpose of putting
cocaine in the gas tank.  The Michigan Court of Appeals reviewed this claim for clear error
and determined that the remarks were proper.

An opening statement is not an appropriate occasion for argument, *United States
v. Dinitz*, 424 U.S. at 612, 96 S. Ct. at 1082 (Burger, C.J., concurring), and prosecutors
have an obligation to "put forth only proper arguments based on the evidence in the
record."  *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (quoting *Bates v. Bell*, 402

26

F.3d 635, 641 (6th Cir. 2005)).  Although there was no direct testimony that the tools found

in Petitioner's rented car were used on the Chevy Blazer to conceal the cocaine,

> the prosecutor did not specifically allege in his opening statement that he
> would establish that the tools found in the trunk of the Taurus were used to
> remove the gas tank from the Blazer.  Instead, the prosecutor noted that the
> tools found in the Taurus were the kind of tools needed to remove a gas tank
> from a vehicle.  He discussed this evidence, along with evidence that
> defendants admitted that they knew each other, that [Petitioner] and Rhodes
> were detained when attempting to enter Turrentine's hotel room, and that
> [Petitioner] and Rhodes had a key to the hotel room, as circumstantial
> evidence that [Petitioner], Rhodes, and Turrentine were involved in a
> conspiracy to transport cocaine by hiding it in the gas tank of a rental vehicle.

*Lott*, Mich. Ct. App. No. 265051, at 7.

Furthermore, the prosecutor presented evidence supporting the inference that the

tools in Petitioner's rented car were used in the crime.  Deputy Sheriff Kenneth Rumps

testified that a tool found in Petitioner's rented car was similar to the tool used by the

county mechanics to remove the drive shaft from the Chevy Blazer.  (Tr. Jan. 12, 2005, at

200.)[4]

Even though the prosecutor's conduct and remarks were deliberate, they were not

so pronounced and persistent as to permeate the entire trial with unfairness.  In addition,

the trial court twice instructed the jurors that the opening statements were not evidence.

(Tr. Jan. 12, 2005, at 115; Tr. 14, 2005, at 73.)  Under the circumstances, the alleged

misconduct was not flagrant and does not entitle Petitioner to relief.

### 4.  The Prosecutor's Use of Co-defendant Rhodes' Statement

Petitioner contends that the prosecutor failed to prepare a properly redacted script

---

[4] The drive shaft had to be removed to get to the gas tank.  (Tr. Jan. 12, 2005, at
226.)

for Sergeant Mekoski to use when testifying about his interrogation of Kareem Rhodes. According to Petitioner, Mekoski erred when he testified that Rhodes told him that "we had got them" just prior to making the delivery.  Mekoski apparently should have redacted Rhodes' statement and said that Rhodes told him, "I had got them" just before the delivery. The remark, however was an isolated one and accidentally made by Mekoski, despite the prosecutor's intention to have all references to "we" replaced with "I."  The remark likely did not prejudice Petitioner because it was ambiguous, and the evidence against Petitioner was strong.  The Court therefore finds that the alleged failure to properly prepare the witness was not flagrant.

### 5.  The Prosecutor's Closing Argument

During closing arguments, the prosecutor stated that Petitioner pulled up to the hotel in the Ford Taurus immediately before a dog trained to detect narcotics reacted to the driver's door handle on the car.  Petitioner claims that this remark implied that he was seen driving the Taurus and pulling into the hotel parking lot and that he must have left the drug residue on the driver's door handle of the Taurus.

Prosecutors may not argue facts not in evidence, *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004) (citing *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L.Ed. 1314 (1935)), but Petitioner admitted to the police that he had rented the Ford Taurus on the previous day.  He also admitted that he went to Roseville to meet Ronnie Turrentine and that he had intended to stay with Turrentine at the Extended Stay Hotel.  He even provided the keys to the Taurus to the police so that they could search it.  There was additional evidence that items in the trunk of the rented car smelled like gasoline and that a tool in the trunk was similar to one used by county mechanics when they removed the gas tank from

28

the Chevy Blazer.

The jury could have inferred from this evidence and other evidence that Petitioner drove the Taurus to the hotel, was involved with Turrentine in drug trafficking, and that he left drug residue on the door handle of the Ford Taurus.   The Court therefore agrees with the Michigan Court of Appeals that the prosecutor's argument was a reasonable inference arising from the evidence.  As such, the argument was proper.  *Byrd v. Collins*, 209 F.3d 486, 535-36 (6th Cir. 2000).

### 6. Conclusion on Petitioner's claim of prosecutorial misconduct

Petitioner has failed to show that the prosecutor's conduct was improper and flagrant.   The Court therefore declines to grant relief on the basis of Petitioner's prosecutorial-misconduct claim.

### C.  The Right to Confront Witnesses

As previously explained, Sergeant Mekoski testified that he asked Rhodes during a custodial interrogation when the narcotics were expected to be picked up.  Rhodes responded that "they were supposed to be delivered later on that day.  That we had got them just before, just prior to making the delivery."  (Tr. Jan. 13, 2005, at 115.)   Petitioner claims that this testimony was improper hearsay by a non-testifying co-defendant and that the testimony violated his right to confront the witnesses against him.

The Michigan Court of Appeals  reviewed this claim for "plain error" because Petitioner did not object at trial to the admission of Sergeant Mekoski's testimony.  The Court of Appeals then determined that the alleged error was harmless because the challenged statement did not contradict Petitioner's theory of the case or otherwise inculpate him.

The Supreme Court has held that testimonial hearsay may be introduced against a defendant in a criminal trial only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the person. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). In addition, under *Bruton v. United States*, 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), "a defendant is deprived of his rights under the Confrontation Clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Cruz v. New York*, 481 U.S. 186, 187-188, 107 S.Ct. 1714, 1716, 95 L.Ed. 2d 162 (1987).

Sergeant Mekoski testified about the contents of Kareem Rhodes' statement to him even though Rhodes was a nontestifying co-defendant and Petitioner did not have a prior opportunity to cross-examine Rhodes. Nevertheless, the parties agreed that Sergeant Mekoski could discuss Rhodes' statement, provided that he did not mention Petitioner or Ronnie Turrentine. (Tr. Jan. 12, 2005, at 7-9.) Petitioner likely waived his constitutional arguments by agreeing to have Sergeant Mekoski testify about Rhodes' statement and by assenting to a negotiated redaction of the statement. *United States v. Herrera-Genao*, Nos. 09-2468, 09-2544, 09-2586, 2011 WL 1053826, at *5 (3d Cir. Mar. 24, 2011) (unpublished).

> Even if Petitioner did not waive the argument,
>
> [t]he mere finding of a violation of the *Bruton* rule . . . does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

30

*Schneble v. Florida*, 405 U.S. 427, 430, 92 S. Ct. 1056, 1059, 31 L. Ed. 2d 340 (1972).

*Crawford* errors also are subject to harmless-error analysis. *See Fulcher v. Motley*, 444

F.3d 791, 822 (6th Cir. 2006). "A Confrontation Clause violation is cause for federal

habeas relief only if it has 'a substantial and injurious effect or influence in determining the

jury's verdict.'" *Id*. (quoting *Brecht v. Abrahamson*, 507 U.S. at 623, 113 S.Ct. 1710).

The objection here is to Sergeant Mekoski's comment that Kareem Rhodes informed

him that "we got them" prior to the delivery of the narcotics. Petitioner apparently interprets

this testimony to mean that Rhodes said he and Petitioner got the narcotics shortly before

they were intending to deliver the narcotics. The actual testimony, however, was

ambiguous and susceptible to more than meaning.

Even if the jury interpreted the disputed remark to implicate Petitioner, the other

evidence of his guilt was substantial:

> Turrentine was found in possession of 11 kilos of cocaine. [Petitioner]
> admitted that he knew Turrentine and planned to stay in his hotel room that
> night. [Petitioner] and Rhodes were detained as they attempted to enter
> Turrentine's hotel room, and a key to the hotel room was found in their
> possession. [Petitioner] admitted that he was driving a Ford Taurus that he
> rented the day before, and that he spent most of the day in the car. When
> officers searched the Taurus, they found tools that could be used to hide
> drugs in the gas tank of a vehicle and plastic, heat sealers, and other
> implements used for packaging cocaine. Further, a police dog indicated that
> he smelled narcotics on the trunk and on the driver's side door handle of the
> Taurus. This circumstantial evidence, taken together, reasonably supports
> a finding that [Petitioner] was involved in handling and hiding drugs in a
> vehicle for transport and that, in so doing, he had control over the drugs. In
> addition, other than [Petitioner's] denials of wrongdoing to the police, little
> evidence was presented contradicting this inference that [Petitioner] had
> been in possession of cocaine.

> The evidence also establishe[d] that [Petitioner] intended to deliver
> cocaine. A juror may infer intent to deliver "from the quantity of narcotics in
> a defendant's possession, from the way in which those narcotics are
> packaged, and from other circumstances surrounding the arrest." *People v.*

*Wolfe*, 440 Mich. 508, 524; 489 NW2d 748 (1992), amended 441 Mich. 1201 (1992). The police found over 11 kilos of cocaine, with a street value approaching $5,000,000, in the gas tank of Turrentine's car. The cocaine was packaged in heat-sealed plastic bags used for transport, storage, and delivery. Tools used for packaging cocaine and hiding it in the gas tank of a vehicle were found in the car [Petitioner] had been driving that day. Rhodes also admitted that the cocaine was scheduled for delivery that night.

　　　. . . .

Further, the prosecution presented evidence establishing that [Petitioner] committed this offense in conjunction with (at least) Turrentine and Rhodes. Again, [Petitioner], Rhodes, and Turrentine admitted that they knew each other and [Petitioner] and Rhodes were detained as they attempted to enter Turrentine's hotel room. Tools used to remove a gas tank from a vehicle, heat sealers, and plastic used to package cocaine were found in the Taurus that [Petitioner] had been driving that day, and a police dog indicated that drug residue was on the car. Cocaine heat-sealed in plastic was found in the gas tank of Turrentine's rented Blazer.

*Lott*, Mich. Ct. App. No. 265051, at 20-21.

Petitioner alleges that testimony about Rhodes' statement was not harmless because there was no other evidence linking him to the drugs found in the Chevy Blazer. He also alleges that there was no other evidence that he knew about Mr. Turrentine or the cocaine found in the Blazer. The Court disagrees. The record indicates that Petitioner admitted to the police that he went to the Roseville area to meet Turrentine, who was a long-time friend, and that he intended to stay with Turrentine at the Extended Stay Hotel so that he would not have to pay for a hotel room while he was in town. (Tr. Jan. 13, 2005, at 110-11, 135, 137-39.)

The record also indicates that the police located Petitioner at Turrentine's room at the Extended Stay Hotel and observed him trying to enter the room. (Tr. Jan. 13, 2005, at 6-9.) He had a key to the room (Tr. Jan. 12, 2005, at 206-07), and he admitted that he had rented the Ford Taurus where tools, latex gloves, and clothing that might have been

32

used to work on the Chevy Blazer were found.   A dog alerted to the smell of narcotics on

the vehicle.  (Tr.  Jan. 13, 2005, at 72-75).  The Court concludes that any error under

*Crawford* or *Bruton* as a result of Sergeant Mekoski's comments about Kareem Rhodes'

custodial statement was harmless.

### D.  The Cumulative Effect of Errors

Petitioner claims that the combined effect of the trial errors deprived him of his right

to due process and a fair trial.   According to Petitioner, the evidence at trial was not

overwhelming and there was no physical evidence linking him to the cocaine or to the

Chevy Blazer where the cocaine was found.

The Court finds no merit in Petitioner's claim because, as explained above, "[t]he

Supreme Court has not held that distinct constitutional claims can be cumulated to grant

habeas relief."  *Lorraine v. Coyle*, 291 F.3d at 447.  Therefore, it cannot be said that the

state court's decision was contrary to Supreme Court precedent.  Constitutional errors that

would not individually support habeas relief cannot be cumulated to support habeas relief.

*Moore v. Parker*, 425 F.3d at 256.

## IV.  CONCLUSION

Petitioner was entitled to "a fair trial, not a perfect one."  *Ross v. Oklahoma*, 487 U.S.

81, 91, 108 S. Ct. 2273, 2280, 101 L.Ed.2d 80 (1988)(quoting *Delaware v. Van Arsdall*, 475

U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986)).   Habeas review is

precluded because there are reasonable arguments supporting the state court's conclusion

that Petitioner's allegations lack merit, and fairminded jurists could disagree on whether the

state court erred.  Accordingly, the petition for writ of habeas corpus [Docket No. 1, filed

Oct. 15, 2008] is **DENIED**.

Reasonable jurists could debate the Court's assessment of Petitioner's first claim regarding Petitioner's trial attorney and also conclude that the claim deserves encouragement to proceed further. Therefore, a certificate of appealability may issue on claim one. *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000). Reasonable jurists would not find the Court's assessment of Petitioner's

second, third, and fourth claims debatable or wrong. The Court therefore declines to issue a certificate of appealability on claims two through four.


s/Denise Page Hood
United States District Judge

Dated: June 30, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 30, 2011, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

34